## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 15 2020, 8:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ronald J. Moore
The Moore Law Firm, LLC
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Lawyer-Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Matter of the Termination of the Parent-Child Relationship of L.H. (Minor Child); <br><br> D.H. (Father), <br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br> *Appellee-Petitioner.* | April 15, 2020 <br><br> Court of Appeals Case No. 19A-JT-2603 <br><br> Appeal from the Randolph Circuit Court <br><br> The Honorable Jay L. Toney, Judge <br><br> Trial Court Cause No. 68C01-1905-JT-70 |

**Pyle, Judge**

# Statement of the Case

[1] D.H. ("Father") appeals the termination of the parent-child relationship with his son, L.H., ("L.H."), claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in L.H.'s removal will not be remedied; (2) termination is in L.H.'s best interests; and (3) adoption is a satisfactory plan for L.H.'s care and treatment. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.[1]

[2] We affirm.

# Issue

> Whether there is sufficient evidence to support the termination of
> the parent-child relationship.

# Facts

[3] The evidence and reasonable inferences that support the judgment reveal that L.H. was born in August 2013. DCS removed L.H. from his home in October 2016 and placed him in foster care with his maternal uncle's family because of his parents' substance abuse and domestic violence.

---

[1] L.H.'s mother ("Mother") voluntarily relinquished her parental rights in January 2019, and she is not a party to this appeal.

[4] In November 2016, the trial court adjudicated L.H. to be a child in need of services ("CHINS"). In a December 2016 dispositional decree, the trial court ordered Father to: (1) abstain from the use of illegal drugs; (2) complete a substance abuse assessment; (3) complete a parenting assessment; (4) maintain stable and suitable housing; (5) participate in supervised visitation; and (6) submit to random drug screens.

[5] After Father failed to comply with the dispositional decree, in May 2019, DCS filed a petition to terminate Father's parental relationship with L.H. At the termination hearing, Father, who was incarcerated, admitted that: (1) his drug screens during the course of the proceedings had been positive for methamphetamine and amphetamines; (2) he had never completed a parenting assessment; (3) he had never completed a substance abuse assessment; (4) he had been arrested several times during the pendency of the proceedings and charged with multiple offenses such as maintaining a common nuisance (controlled substances), possession of paraphernalia, possession of methamphetamine, unlawful possession of syringes, driving while suspended, and battery with bodily injury where the victim was L.H.'s foster father; (5) he had pled guilty to many of these offenses; and (6) he had absconded from work release and been missing for three months during the pendency of the proceedings. The only court-ordered service that Father had completed was supervised visitation from January until March 2017. The trial court suspended visitation in March 2017 because of Father's positive drug screens and ordered that visitation would not resume until Father had three negative drug screens.

Father was never able to do so and, at the time of the termination hearing, had not seen L.H. since March 2017. Father also admitted that he had neither stable housing nor employment.

[6] During the hearing, when DCS pointed out to Father that the case had gone on for nearly three years without Father following the CHINS dispositional order, Father responded that he did not know that there was a time limit on how long he had to do the services and that L.H was with family. Father believed that "the family would . . . want to keep – until we get our lives together, they would just keep him with them. You know, it ain't like he's in foster care[.]" (Tr. Vol. 2 at 155). Father also explained that he had been participating in a Family Engagement program for several months while he was incarcerated and that when he was released from jail, he planned to abstain from the use of drugs, seek drug treatment, seek counseling, and attend NA meetings. Father's earliest release date was January 2020.

[7] Also at the hearing, DCS Family Case Manager Courtney Tanner ("FCM Tanner") testified that the conditions that had led to L.H.'s removal had not been remedied. Specifically, she explained that "throughout the course of [her] involvement in the case . . . it seem[ed] like jail ha[d] been a repeat behavior, incarceration, drug use, and [they] just [had not] been able to have either parent participate in services that would show that they [were] able to . . . appropriately and safely parent [L.H.] (Tr. Vol. 2 at 85).

[8] The evidence further revealed that when DCS placed L.H. with his foster parents, L.H. was behind on his immunizations and had significant dental problems. He was also reserved and shy. At the time of the termination hearing, L.H.'s medical and dental issues had been addressed, he had become involved in a church group, and his school had discussed moving him up to kindergarten ahead of schedule. In addition, after living with his foster parents for almost half of his life, L.H. does not remember Father and is bonded with his foster parents. According to FCM Tanner, L.H. was "very insistent that his placement is his parents." (Tr. Vol. 2 at 94).

[9] Also at the hearing, the child advocate, who had attended all court hearings involving the family, opined that the conditions that had led to L.H.'s removal had not been remedied. Specifically, the child advocate explained that "we continue to have a father that is incarcerated and when he's been out, he has not done the services besides some visitation that has been ordered from the beginning of the case." (Tr. Vol. 2 at 191). According to the child advocate, termination of Father's parental rights and foster parent adoption was in L.H.'s best interests.

[10] Children's Bureau Case Manager Andrew Lykins ("Case Manager Lykins") who had met with Father one hour per week at the jail since October 2018, testified that Father had been "fully engaged" and "completely open" with him. (Tr. Vol. 2 at 40, 41). According to Case Manager Lykins, Father had "gained perspective and insight regarding himself, [had] taken accountability for his actions, which led to this moment now, and [had] a desire to change that

behavior and heal those circumstances which led to the case." (Tr. Vol. 2 at 42). Case Manager Lykins, however, acknowledged that he did not have the ability to address or remedy the major issues involved in the CHINS case and that he had "no ability to ensure that [Father was] going to follow through on the resources [Lykins] gave him to help with substance abuse, anger issues, [and] community resources." (Tr. Vol. 2 at 48).

[11] Following the hearing, the trial court issued a detailed order terminating Father's parental relationship with L.H. Father now appeals.

# Decision

[12] Father argues that there is insufficient evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.,* 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[13] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and

conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[14] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.,* 989 N.E.2d at 1231.

[15] Here, Father argues that there is insufficient evidence to support the termination of his parental rights. Specifically, he first contends that the

evidence is insufficient to show that there is a reasonable probability that the conditions that resulted in L.H.'s removal will not be remedied. In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *E.M.*, 4 N.E.3d at 643.

[16] Here, our review of the evidence reveals that L.H., who was adjudicated to be a CHINS in November 2016, was removed from the home because of his parents' drug use and domestic violence. The evidence at the termination hearing

revealed that Father had not successfully completed any of the court ordered services. Specifically, he had continued to use drugs throughout the proceedings and had lost his supervised visits with L.H. because of his drug use. Father had never completed substance abuse or parenting assessments. At the time of the termination hearing, Father was incarcerated and had no job or housing. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in L.H.'s placement outside the home would not be remedied. We find no error. To the extent that Father highlights his "[diligent work] with Fatherhood Engagement services," (Father's Br. at 8), we note that the trial court was well within its discretion to "disregard the efforts [Father] made only shortly before termination and to weigh more heavily [Father]'s history of conduct prior to those efforts." *In re K.T.K.*, 989 N.E.2d at 1234.

[17]  Father also argues that there is insufficient evidence that the termination is in L.H.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. "'A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that

continuation of the parent-child relationship is contrary to the child's best interest.'" *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind. Ct. App. 2000) (quoting *Matter of Adoption of D.V.H.*, 604 N.E.2d 634, 638 (Ind. Ct. App. 1992), *trans. denied, superseded by rule on other grounds*). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[18] Here, the child advocate testified that termination of Father's parental rights and foster parent adoption was in L.H.'s best interests. The testimony of child advocate, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in L.H.'s best interests.

[19] Father also argues that DCS does not have a satisfactory plan for L.H.'s care and treatment. This Court has previously explained that the plan for the care and treatment of the child need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. 2014). Here, the DCS caseworker testified that the plan for the care and treatment of L.H. is adoption. This is a satisfactory plan. See *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

[20] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232,

1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[21] Affirmed.

Bradford, C.J., and Baker, J., concur.